## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA
450 Fifth Street NW
Washington, DC  20530;

STATE OF ILLINOIS
100 West Randolph Street
Chicago, IL  60601;

COMMONWEALTH OF PENNSYLVANIA
14th Floor, Strawberry Square
Harrisburg, PA  17120; and

COMMONWEALTH OF VIRGINIA
202 North 9th Street
Richmond, VA  23219

      *Plaintiffs*,

  v.

NEXSTAR MEDIA GROUP, INC.
545 E. John Carpenter Freeway, Suite 700
Irving, TX  75062; and

TRIBUNE MEDIA COMPANY
515 North State Street
Chicago, IL  60654

      *Defendants*.

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, and the State of Illinois and the Commonwealths of Pennsylvania and Virginia

("Plaintiff States"), bring this civil action against Nexstar Media Group, Inc. ("Nexstar") and

Tribune Media Company ("Tribune") to enjoin Nexstar's proposed merger with Tribune.  The Plaintiffs allege as follows:

## I.     NATURE OF THE ACTION

1.      Pursuant to an Agreement and Plan of Merger dated November 30, 2018, Nexstar plans to acquire Tribune for approximately $6.4 billion.

2.      The proposed merger would combine two of the largest independent local television station owners in the United States and would combine many popular local television stations that compete against each other in several markets, likely resulting in significant harm to competition.

3.      In twelve Designated Market Areas ("DMAs"), Nexstar and Tribune each own at least one broadcast television station that is an affiliate of one of the "Big 4" television networks: NBC, CBS, ABC, or FOX.  These twelve DMAs, collectively referred to in this Complaint as the "Big 4 Overlap DMAs," are:  (i) Davenport, Iowa-Rock Island-Moline, Illinois; (ii) Des Moines-Ames, Iowa; (iii) Ft. Smith-Fayetteville-Springdale-Rogers, Arkansas; (iv) Grand Rapids-Kalamazoo-Battle Creek, Michigan; (v) Harrisburg-Lancaster-Lebanon-York, Pennsylvania; (vi) Hartford-New Haven, Connecticut; (vii) Huntsville-Decatur-Florence, Alabama; (viii) Memphis, Tennessee; (ix) Norfolk-Portsmouth-Newport News, Virginia; (x) Richmond-Petersburg, Virginia; (xi) Salt Lake City, Utah; and (xii) Wilkes-Barre-Scranton, Pennsylvania.

4.      Additionally, in the Indianapolis, Indiana DMA ("Indianapolis DMA"), Tribune owns two Big 4 stations and Nexstar owns the CW and MyNetworkTV affiliates.  Nexstar's CW station has a higher than usual market share for a CW affiliate because of its strong local news programming; until 2014, the station had been the CBS affiliate in the Indianapolis DMA.  The Big 4 Overlap DMAs and the Indianapolis DMA together are referred to in this Complaint as "Overlap DMAs."

5.      In each Big 4 Overlap DMA, the proposed merger would eliminate competition between Nexstar and Tribune in the licensing of Big 4 network content ("retransmission consent") to cable, satellite, fiber optic television, and over-the-top providers (referred to collectively as multichannel video programming distributors or "MVPDs"), for distribution to their subscribers.  Additionally, in each Overlap DMA, the proposed merger would substantially lessen competition in the sale of broadcast television spot advertising to advertisers interested in reaching viewers in the DMA.

6.      By eliminating a major competitor, the merger would likely give Nexstar the power to charge MVPDs higher fees for its programming—fees that those companies would likely pass on, in large measure, to their subscribers.  Additionally, the merger would likely allow Nexstar to charge local businesses and other advertisers higher prices to reach audiences in the Overlap DMAs.

7.      As a result, the proposed merger of Nexstar and Tribune likely would substantially lessen competition in the markets for licensing Big 4 television retransmission consent in each of the Big 4 Overlap DMAs, and in the markets for selling broadcast television spot advertising in each of the Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.    THE DEFENDANTS

8.      Nexstar is a Delaware corporation with its headquarters in Irving, Texas.  Nexstar owns 171 television stations in 100 DMAs, of which 136 stations are Big 4 affiliates.  In 2018, Nexstar reported revenues of $2.8 billion.

9.      Tribune is a Delaware corporation with its headquarters in Chicago, Illinois. Tribune owns 44 television stations in 33 DMAs, of which 27 stations are Big 4 affiliates.  In 2018, Tribune earned revenues of more than $2.0 billion.

### III.   JURISDICTION AND VENUE

10.    The United States brings this action under Section 15 of the Clayton Act,

15 U.S.C. § 25, as amended, to prevent and restrain Defendants from violating Section 7 of the

Clayton Act, 15 U.S.C. § 18.

11.    The Plaintiff States bring this action under Section 16 of the Clayton Act, 15

U.S.C. § 26, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15

U.S.C. § 18. The Plaintiff States, by and through their respective Attorneys General, bring this

action as parens patriae on behalf of and to protect the health and welfare of their citizens and the

general economy in each of their states.

12.    The Court has subject matter jurisdiction over this action pursuant to Section 15

of the Clayton Act, 15 U.S.C. § 25, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

13.    Defendants license Big 4 television retransmission consent to MVPDs, and sell

broadcast television spot advertising to businesses (either directly or through advertising

agencies), in the flow of interstate commerce, and such activities substantially affect interstate

commerce.

14.    Nexstar and Tribune have consented to venue and personal jurisdiction in this

judicial district.  Both companies transact business in this district.  Venue is therefore proper in

this district under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. §

1391(b)(1) and (c).

### IV.   BIG 4 TELEVISION RETRANSMISSION CONSENT MARKETS

#### A.   Background

15.    MVPDs, such as Comcast, DirecTV, and Charter, typically pay the owner of each

local Big 4 broadcast station in a given DMA a per-subscriber fee for the right to retransmit the

station's content to the MVPD's subscribers.  The per-subscriber fee and other terms under

which an MVPD is permitted to distribute a station's content to its subscribers are set forth in a retransmission agreement.  A retransmission agreement is negotiated directly between a broadcast station group, such as Nexstar or Tribune, and a given MVPD, and this agreement typically covers all of the station group's stations located in the MVPD's service area, or "footprint."

16.     Each broadcast station group typically renegotiates retransmission agreements with the MVPDs every few years.  If an MVPD and a broadcast station group cannot agree on a retransmission consent fee at the expiration of a retransmission agreement, the result may be a "blackout" of the broadcast group's stations from the particular MVPD—i.e., an open-ended period during which the MVPD may not distribute those stations to its subscribers until a new contract is successfully negotiated.

**B.      Relevant Markets**

**1.      Product Market**

17.     Big 4 broadcast content has special appeal to television viewers in comparison to the content that is available through other broadcast stations and cable channels.  Big 4 stations usually are the highest ranked in terms of audience share and ratings in each DMA, largely because of unique offerings such as local news, sports, and highly ranked primetime programs. Viewers typically consider the Big 4 stations to be close substitutes for one another.

18.     Because of Big 4 stations' popular national content and valued local coverage, MVPDs regard Big 4 programming as highly desirable for inclusion in the packages they offer subscribers.

19.     Non-Big 4 broadcast stations are typically not close substitutes for viewers of Big 4 stations.  Stations that are affiliates of networks other than the Big 4, such as the CW

Network, MyNetworkTV, or Telemundo, typically feature niche programming without local news or sports—or, in the case of Telemundo, aimed at a Spanish-speaking audience.  Stations that are unaffiliated with any network are similarly unlikely to carry programming with broad popular appeal.

20.    If an MVPD suffers a blackout of a Big 4 station in a given DMA, many of the MVPD's subscribers in that DMA are likely to turn to other Big 4 stations in the DMA to watch similar content, such as sports, primetime shows, and local news and weather.  This willingness of viewers to switch between competing Big 4 broadcast stations limits an MVPD's expected losses in the case of a blackout, and thus limits a broadcaster's ability to extract higher fees from that MVPD—since an MVPD's willingness to pay higher retransmission consent fees for content rises or falls with the harm it would suffer if that content were lost.

21.    Due to the limited programming typically offered by non-Big 4 stations, viewers are much less likely to switch to a non-Big 4 station than to switch to other Big 4 stations in the event of a blackout of a Big 4 station.  Accordingly, competition from non-Big 4 stations does not typically impose a significant competitive constraint on the retransmission consent fees charged by the owners of Big 4 stations.

22.    For the same reasons, subscribers—and therefore MVPDs—generally do not view cable network programming as a close substitute for Big 4 network content.  This is primarily because cable channels offer different content.  For example, cable channels generally do not offer local news, which provides a valuable connection to the local community that is important to viewers of Big 4 stations.

23.    Because viewers do not regard non-Big 4 broadcast stations or cable networks as close substitutes for the programming they receive from Big 4 stations, these other sources of

programming are not sufficient to discipline an increase in the fees charged for Big 4 television

retransmission consent.  Accordingly, a hypothetical monopolist of Big 4 television stations

would likely increase the retransmission consent fees it charges to MVPDs for those stations by

at least a small but significant amount.

24.     The licensing of Big 4 television retransmission consent therefore constitutes a

relevant product market and line of commerce under Section 7 of the Clayton Act,

15 U.S.C. § 18.

## 2.     Geographic Markets

25.     A DMA is a geographic unit for which A.C. Nielsen Company—a firm that

surveys television viewers—furnishes broadcast television stations, MVPDs, cable and satellite

television networks, advertisers, and advertising agencies in a particular area with data to aid in

evaluating audience size and composition.  DMAs are widely accepted by industry participants

as the standard geographic areas to use in evaluating television audience size and demographic

composition.  The Federal Communications Commission ("FCC") also uses DMAs as

geographic units with respect to its MVPD regulations.

26.     In the event of a blackout of a Big 4 network station, FCC rules generally prohibit

an MVPD from importing the same network's content from another DMA.  Thus, Big 4 viewers

in one DMA cannot switch to Big 4 programming in another DMA in the face of a blackout.

Therefore, substitution to stations outside the DMA cannot discipline an increase in the fees

charged for retransmission consent for broadcast stations in the DMA.  Each DMA thus

constitutes a relevant geographic market for the licensing of Big 4 television retransmission

consent within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### C.      Likely Anticompetitive Effects

27.     The more concentrated a market would be as a result of a proposed merger, the more likely it is that the proposed merger would substantially lessen competition.  Concentration can be measured by the widely used Herfindahl-Hirschman Index ("HHI").[1]  Under the *Horizontal Merger Guidelines* issued by the Department of Justice and the Federal Trade Commission, mergers that result in highly concentrated markets (i.e., with an HHI over 2,500) and that increase the HHI by more than 200 points are presumed likely to enhance market power.

28.     The chart below summarizes Defendants' approximate Big 4 television retransmission consent market shares, based on revenue, and the effect of the transaction on the HHI in each Big 4 Overlap DMA.[2]

| Big 4 Overlap DMA | Nexstar Share | Tribune Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Wilkes Barre, PA | 54.0% | 24.7% | 78.7% | 3981 | 6645 | 2664 |
| Ft. Smith, AR | 63.4% | 15.0% | 78.4% | 4708 | 6613 | 1906 |
| Norfolk, VA | 56.0% | 21.1% | 77.1% | 4104 | 6465 | 2361 |
| Grand Rapids, MI | 43.4% | 16.3% | 59.7% | 2974 | 4391 | 1417 |
| Hartford, CT | 33.5% | 25.4% | 58.9% | 2636 | 4338 | 1702 |
| Memphis, TN | 38.4% | 17.6% | 56.1% | 2762 | 4118 | 1356 |
| Davenport, IA | 36.8% | 14.9% | 51.6% | 2744 | 3838 | 1094 |
| Des Moines, IA | 34.5% | 13.9% | 48.4% | 2798 | 3756 | 958 |
| Huntsville, AL | 32.5% | 16.6% | 49.1% | 2630 | 3710 | 1080 |
| Salt Lake City, UT | 32.1% | 15.5% | 47.5% | 2691 | 3683 | 992 |

---

[1] The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$).  The HHI takes into account the relative size distribution of the firms in a market.  It approaches zero when a market is occupied by a large number of firms of relatively equal size, and reaches its maximum of 10,000 points when a market is controlled by a single firm.  The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

[2] In this chart and the one below, sums that do not agree precisely reflect rounding.

| Big 4 Overlap DMA | Nexstar Share | Tribune Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Harrisburg, PA | 25.3% | 22.1% | 47.4% | 2553 | 3670 | 1117 |
| Richmond, VA | 28.0% | 16.9% | 44.9% | 2672 | 3617 | 945 |

29.     As indicated by the preceding chart, the post-merger HHI in each Big 4 Overlap DMA is well above 2,500, and the HHI increase in each Big 4 Overlap DMA far exceeds the 200-point threshold.  Thus, the proposed merger presumptively violates Section 7 of the Clayton Act in each Big 4 Overlap DMA.

30.     The proposed merger would enable Nexstar to black out more Big 4 stations simultaneously in each of the Big 4 Overlap DMAs than either Nexstar or Tribune could black out independently today, likely leading to increased retransmission consent fees charged to such MVPDs.

31.     Retransmission consent fees generally are passed through to an MVPD's subscribers in the form of higher subscription fees or as a line item on their bills.

32.     For these reasons, the proposed merger of Nexstar and Tribune likely would substantially lessen competition in the licensing of Big 4 television retransmission consent in each of the Big 4 Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

### V.     BROADCAST TELEVISION SPOT ADVERTISING MARKETS
### A.     Background

33.     Broadcast television stations, including both Big 4 broadcast stations and non-Big 4 stations in the Overlap DMAs, sell advertising "spots" during breaks in their programming. Advertisers purchase spots from a broadcast station to communicate with viewers within the DMA in which the broadcast television station is located.  Broadcast television spot advertising is distinguished from "network" advertising, which consists of advertising time slots sold on

nationwide broadcast networks by those networks, and not by local broadcast stations or their

representatives.

34.     Nexstar and Tribune compete with one another to sell broadcast television spot

advertising in each of the Overlap DMAs.

**B.     Relevant Markets**

**1.     Product Market**

35.     Broadcast television spot advertising, including spot advertising on both Big 4

and non-Big 4 broadcast stations, constitutes a relevant product market and line of commerce

under Section 7 of the Clayton Act, 15 U.S.C. § 18.  Advertisers' inability or unwillingness to

substitute to other types of advertising in response to a price increase in broadcast television spot

advertising supports this relevant market definition.

**i.  Overview of Local Broadcast Television Spot Advertising**

36.     Typically, an advertiser purchases broadcast television advertising spots as one

component of an advertising strategy that may also include cable spots, newspaper

advertisements, billboards, radio spots, digital advertisements, email advertisements, and direct

mail.

37.     Different components of an advertising strategy generally target different

audiences and serve distinct purposes.  Advertisers that advertise on broadcast stations do so

because the stations offer popular programming such as local news, sports, and primetime and

syndicated shows that are especially attractive to a broad demographic base and a large audience

of viewers.  Other categories of advertising may offer different characteristics, making them

potential complements to broadcast television advertising, but not close substitutes.  For

example, ads associated with online search results target individual consumers or respond to

specific keyword searches, whereas broadcast television advertising reaches a broad audience throughout a DMA.

38.     Technological developments may bring various advertising categories into closer competition with each other.  For example, broadcasters and cable networks are developing technology to make their spot advertising addressable, meaning that broadcasters could deliver targeted advertising in live broadcast and on-demand formats to smart televisions or streaming devices.  For certain advertisers, these technological changes may make other categories of advertising closer substitutes for advertising on broadcast television in the future.  However, at this time, for many broadcast television spot advertising advertisers, these projected developments are insufficient to mitigate the effects of the merger in the Overlap DMAs.

### ii.  Cable Television Spot Advertising

39.     MVPDs sell spot advertising to be shown during breaks in cable network programming.  For viewers, these advertisements are similar to broadcast ads.  That, however, does not mean that cable television spot advertising should be included in the product market. For the following reasons, cable television spot advertising is at this time a relatively ineffective substitute for broadcast television spot advertising for most advertisers.

40.     First, broadcast television spot advertising is a more efficient option than cable television spot advertising for many advertisers.  Because broadcast television offers highly rated programming with broad appeal, each broadcast television advertising spot typically offers the opportunity to reach more viewers (more "ratings points") than a single spot on a cable channel. By contrast, MVPDs offer dozens of cable channels with specialized programs that appeal to niche audiences.  This fragmentation allows advertisers to target narrower demographic subsets

by buying cable spots on particular channels, but it does not meet the needs of advertisers who want to reach a large percentage of a DMA's population.

41.     Second, households that have access to cable networks are divided among multiple MVPDs within a DMA.  In some DMAs, MVPDs sell some spot advertising through consortia called "interconnects."  Sometimes these interconnects include all of the largest MVPDs in a DMA, approaching but not matching broadcast stations' reach.  But in other, especially smaller DMAs, the interconnect only contains a subset of MVPDs, which reduces the reach of the interconnect's advertisements.  In contrast, broadcast television spot advertising reaches all households that subscribe to an MVPD and, through an over-the-air signal, most households with a television that do not.

42.     Finally, MVPDs' inventory of cable television spot advertising is limited—typically to two minutes per hour—contrasting sharply with broadcast stations' much larger number of minutes per hour.  The inventory of DMA-wide cable television spot advertising is substantially further reduced by the large portion of those spots allocated to local zone advertising, in which an MVPD sells spots by geographic zones within a DMA, allowing advertisers to target smaller geographic areas.  Due to the limited inventories and lower ratings associated with cable television spot programming, cable television spot advertisements cannot offer a sufficient volume of ratings points, or broad enough household penetration, to provide a viable alternative to broadcast television spot advertising at this time.  Because of these limitations, MVPDs and interconnects would be unable to expand output or increase sales sufficiently to defeat a small but significant increase in the prices charged for broadcast television spot advertising in a given DMA.

### iii. Digital Advertising

43.     Digital advertising is not a sufficiently close substitute for broadcast television spot advertising.  Some digital advertising, such as static and floating banner advertisements, static images, text advertisements, wallpaper advertisements, pop-up advertisements, flash advertisements, and paid search results, lacks the combination of sight, sound, and motion that makes television spot advertising particularly impactful and memorable and therefore effective for advertisers.  Digital video advertisements, on the other hand, do allow for a combination of sight, sound, and motion, and on this basis are more comparable to broadcast television spot advertising than other types of digital advertising, but are still not close substitutes for broadcast television spot advertising for the reasons stated below.

44.     First, digital advertisements typically reach a different audience than broadcast television spot advertising.  Whereas advertisers use broadcast television spots to reach a large percentage of households in a DMA, advertisers use digital advertising to reach a variety of different audiences.  While a small portion of advertisers purchase DMA-wide advertisements on digital platforms, digital advertisements usually are targeted either very broadly, such as nationwide or regional, or to a smaller geographic target, such as a city or a zip code, or to narrow demographic subsets of a population.

45.     Second, inventory of ad-supported, high-quality, long-form video on the internet is limited.  Advertisers see value to advertising on video that is watched by the audience they seek to target.  High-quality, long-form video is the most similar content to broadcast television programming available on the internet.  The most popular high-quality, long-form video available on the internet is provided through ad-free subscription services (like Netflix or Amazon Prime), over-the-top MVPDs that sell cable television spot advertisements (like Sling

13

and YouTube TV), or sold directly by the networks on their own network sites.  The remaining inventory of digital advertisements attached to high-quality, long-form video on the internet, which is primarily sold by digital advertising platforms, is small today.  Because of these limitations, digital video advertising would be unable to expand output or increase sales sufficiently to defeat a small but significant increase in the prices charged for broadcast television spot advertising in a given DMA.

### iv.  Other Forms of Advertising

46.     Other forms of advertising, such as radio, newspaper, billboard, and direct-mail advertising, also do not constitute effective substitutes for broadcast television spot advertising. These forms of media do not reach as many local viewers or drive brand awareness to the same extent as broadcast television does.  Broadcast television spot advertising possesses a unique combination of attributes that advertisers value in a way that sets it apart from advertising on other media.  Broadcast television spot advertising combines sight, sound, and motion in a way that makes television advertisements particularly memorable and impactful.

47.     For all of these reasons, advertisers likely would not respond to a small but significant non-transitory increase in the price of broadcast television spot advertising by switching to other forms of advertising—such as cable, digital, print, radio, or billboard advertising—in sufficiently large numbers to make the price increase unprofitable.

### v.  Broadcasters' Negotiations with Advertisers and Internal Analyses

48.     While cable spot or digital advertising may constrain broadcast television spot advertising prices in the future, it does not do so today.  On a cost-per-point basis (cost to reach one percent of a relevant target population), over the last few years broadcast television spot advertising prices have generally remained steady or increased.  If cable spot or digital

advertising was a close and robust competitor to broadcast television spot advertising, then, all else being equal, competition from cable spot or digital advertising would place downward pressure on broadcast television spot advertising pricing. But they have not had this effect.

49.     The differentiation between broadcast television spot advertising and cable spot and digital advertising bears out in negotiations between broadcasters and advertisers. Advertisers usually will put an advertising buy out to bid to many or all broadcast stations in a DMA, and will not include MVPDs or digital advertisers in that same bid. In negotiations with broadcast stations, advertisers regularly discuss offered prices and opportunities from other broadcast stations in the same DMA to try to bargain down price, but they rarely discuss price offers or opportunities from MVPDs or digital advertisers in those negotiations. When a broadcaster salesperson internally analyzes the station's performance on any particular buy, the salesperson typically looks at the percentage of the buy that was allocated to each broadcast station, adding up to 100% of the buy. The salesperson typically does not consider any allocation of an advertiser's spending on cable or digital advertising. Likewise, if an advertiser reports to a broadcaster salesperson the percentage of a buy that the broadcaster received, the advertiser typically reports the broadcaster's percentage of the amount awarded to all broadcast stations in the DMA, but does not include any amount spent on cable or digital advertising.

50.     Internally, broadcasters make most of their competitor comparisons against other broadcasters in the same DMA, not against MVPDs in that DMA or digital advertisers. When reporting to their station managers and corporate headquarters, broadcast station sales executives regularly report on their performance vis-à-vis other broadcast stations in the DMA; they rarely report on their performance against cable or digital platforms. When looking for new business, broadcast stations use third-party services to identify advertisers advertising on other broadcast

stations, but do not subscribe to similar services for cable or digital advertising.  Similarly, the national sales representation firms regularly report to broadcast stations about competition from representatives for other broadcasters in the same DMA, but rarely report on competition from representatives for cable or digital platforms.  Many broadcasters use a third-party data analysis service to help set their spot advertising rate cards; that service uses market share estimates from other broadcasters as input data to generate the rate cards, but does not use market share estimates from cable or digital advertising platforms.

## 2.    Geographic Markets

51.    For an advertiser seeking to reach potential customers in a given DMA, broadcast television stations located outside of the DMA do not provide effective access to the advertiser's target audience.  The signals of broadcast television stations located outside of the DMA generally do not reach any significant portion of the target DMA through either over-the-air signal or MVPD distribution.  Because advertisers cannot reach viewers inside a DMA by advertising on stations outside the DMA, a hypothetical monopolist of broadcast television spot advertising on stations in a given DMA would likely implement at least a small but significant non-transitory price increase.

52.    Each of the Overlap DMAs accordingly constitutes a relevant geographic market for the sale of broadcast television spot advertising within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## C.    Likely Anticompetitive Effects

53.    The chart below summarizes Defendants' approximate market shares and the result of the transaction on the HHIs in the sale of broadcast television spot advertising in each of the Overlap DMAs.

| Overlap DMA | Nexstar Share | Tribune Share | Merged Share | Pre-Merger HHI | Post-Merger HHI | HHI Increase |
|---|---|---|---|---|---|---|
| Wilkes Barre, PA | 35.8% | 47.6% | 83.4% | 3749 | 7161 | 3412 |
| Norfolk, VA | 44.0% | 31.4% | 75.4% | 3277 | 6038 | 2761 |
| Ft. Smith, AR | 29.1% | 41.3% | 70.3% | 3361 | 5761 | 2400 |
| Davenport, IA | 27.0% | 27.1% | 54.2% | 3568 | 5035 | 1467 |
| Grand Rapids, MI | 36.0% | 19.0% | 55.0% | 2700 | 4065 | 1365 |
| Des Moines, IA | 11.2% | 34.6% | 45.8% | 3235 | 4009 | 774 |
| Richmond, VA | 20.9% | 29.9% | 50.8% | 2733 | 3981 | 1248 |
| Huntsville, AL | 13.9% | 33.0% | 46.9% | 2786 | 3704 | 918 |
| Memphis, TN | 14.5% | 33.3% | 47.9% | 2558 | 3527 | 969 |
| Harrisburg, PA | 21.8% | 20.8% | 42.5% | 2524 | 3427 | 903 |
| Indianapolis, IN | 13.1% | 31.0% | 44.2% | 2577 | 3393 | 815 |
| Hartford, CT | 22.7% | 20.6% | 43.3% | 2306 | 3240 | 934 |
| Salt Lake City, UT | 16.0% | 24.1% | 40.0% | 2329 | 3098 | 769 |

54.    Defendants' large market shares reflect the fact that, in each Overlap DMA, Nexstar and Tribune each own one or more significant broadcast stations. As indicated by the preceding chart, the post-merger HHI in each Overlap DMA is well above 2,500, and the HHI increase in each Overlap DMA far exceeds the 200-point threshold above which a transaction is presumed to enhance market power and harm competition. Defendants' proposed transaction is thus presumptively unlawful in each Overlap DMA.

55.    In addition to substantially increasing the concentration levels in each Overlap DMA, the proposed merger would combine Nexstar's and Tribune's broadcast television stations, which are close substitutes and generally vigorous competitors in the sale of broadcast television spot advertising. In each Overlap DMA, Defendants' broadcast stations compete head-to-head in the sale of broadcast television spot advertising. Advertisers obtain lower prices as a result of this competition. In particular, advertisers in the Overlap DMAs can respond to an increase in one station's spot advertising prices by purchasing, or threatening to purchase, advertising spots on one or more stations owned by different broadcast station groups—"buying

around" the station that raises its prices.  This practice allows the advertisers either to avoid the first station's price increase, or to pressure the first station to lower its prices.

56.     If Nexstar acquires Tribune's stations, advertisers seeking to reach audiences in the Overlap DMAs would have fewer competing broadcast television alternatives available to meet their advertising needs, and would find it more difficult and costly to buy around higher prices imposed by the combined stations.  This would likely result in increased advertising prices, lower quality local programming to which the spot advertising is attached (for example, less investment in local news), and less innovation in providing advertising solutions to advertisers.

57.     For these reasons, the proposed merger likely would substantially lessen competition in the sale of broadcast television spot advertising in each of the Overlap DMAs, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## VI.     ABSENCE OF COUNTERVAILING FACTORS

58.     Entry of a new broadcast station into an Overlap DMA would not be timely, likely, or sufficient to prevent or remedy the proposed merger's likely anticompetitive effects in the relevant markets.  The FCC regulates entry through the issuance of broadcast television licenses, which are difficult to obtain because the availability of spectrum is limited and the regulatory process associated with obtaining a license is lengthy.  Even if a new signal were to become available, commercial success would come over a period of many years, if at all.

59.     Defendants cannot demonstrate merger-specific, verifiable efficiencies sufficient to offset the proposed merger's likely anticompetitive effects.

## VII.   VIOLATIONS ALLEGED

60.     The proposed merger of Nexstar and Tribune likely would substantially lessen competition in interstate trade and commerce, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  The merger likely would have the following effects, among others:

   a.     competition in the licensing of Big 4 television retransmission consent in each of the Big 4 Overlap DMAs likely would be substantially lessened;

   b.     competition between Nexstar and Tribune in the licensing of Big 4 television retransmission consent in each of the Big 4 Overlap DMAs would be eliminated;

   c.     the fees charged to MVPDs for the licensing of retransmission consent in each of the Big 4 Overlap DMAs likely would increase;

   d.     competition in the sale of broadcast television spot advertising in each of the Overlap DMAs likely would be substantially lessened;

   e.     competition between Nexstar and Tribune in the sale of broadcast television spot advertising in each of the Overlap DMAs would be eliminated; and

   f.     prices for spot advertising on broadcast television stations in each of the Overlap DMAs likely would increase, the quality of local programming likely would decrease, and Defendants likely would be less innovative in providing advertising solutions to advertisers.

## VIII.   RELIEF REQUESTED

61. The Plaintiffs request that:

   a.     the Court adjudge the proposed merger to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

b.      the Court enjoin and restrain Defendants from carrying out the merger, or entering into any other agreement, understanding, or plan by which Nexstar would merge with, acquire, or be acquired by Tribune, or Nexstar and Tribune would combine any of their respective Big 4 stations in the Big 4 Overlap DMAs or their stations in the Indianapolis DMA;

c.      the Court award Plaintiffs the costs of this action; and

d.      the Court award such other relief to Plaintiffs as the Court may deem just and proper.

Dated: July 31, 2019

Respectfully submitted,

FOR PLAINTIFF UNITED STATES OF AMERICA

MAKAN DELRAHIM (D.C. Bar # 457795)
Assistant Attorney General for Antitrust

ANDREW C. FINCH
Principal Deputy Assistant Attorney General

PATRICIA A. BRINK
Director of Civil Enforcement

OWEN M. KENDLER
Chief, Media, Entertainment & Professional
Services Section

YVETTE TARLOV (D.C. Bar # 442452)
Assistant Chief, Media, Entertainment &
Professional Services Section

LEE F. BERGER (D.C. Bar # 482435)
LAUREN G.S. RIKER
GARRETT LISKEY
United States Department of Justice
Antitrust Division
Media, Entertainment & Professional
Services Section
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530
Telephone: (202) 598-2698
Facsimile: (202) 514-7308

**FOR PLAINTIFF STATE OF ILLINOIS:**

KWAME RAOUL
Attorney General


Elizabeth L. Maxeiner
Assistant Attorney General, Antitrust Bureau
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
Phone: 312-814-5470
Facsimile: 312-814-4209
E-mail: emaxeiner@atg.state.il.us

FOR THE COMMONWEALTH OF PENNSYLVANIA

Josh Shapiro
Attorney General

James A. Donahue, III
Executive Deputy Attorney General
Public Protection Division

Tracy W. Wertz
Chief Deputy Attorney General
Antitrust Section


Joseph S. Betsko
PA ID #82620
Senior Deputy Attorney General

Jennifer A. Thomson
PA ID #89360
Senior Deputy Attorney General

Antitrust Section
Office of Attorney General
14th Floor, Strawberry Square
Harrisburg, PA 17120
Telephone: (717) 787-4530
Fax: (717) 787-1190
E-mail: jthomson@attorneygeneral.gov

# FOR PLAINTIFF COMMONWEALTH OF VIRGINIA

Mark R. Herring
Attorney General

Cynthia E. Hudson
Chief Deputy Attorney General

Samuel T. Towell
Deputy Attorney General
Civil Division

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Chief
Consumer Protection Section


_Sarah Oxenham Allen_

Sarah Oxenham Allen
VA Bar #33217
Senior Assistant Attorney General and Unit Manager
Tyler T. Henry
VA Bar #87621
Assistant Attorney General

Antitrust Unit
Office of Attorney General
202 North 9th Street
Richmond, VA  23219
Telephone:  (804) 786-6657
Fax:  (804) 786-0122
E-mail:  soallen@oag.state.va.us